William A. Murphey *et al.*

*vs.*

The Mayor and Council of Wilmington *et al.*

New Castle, Feb. T. 1879.

*Public improvements by municipality; diversion of water-course; assessments; description of property; defective construction of improvement.*

1. A small stream which passes through a city in a devious course, collecting foul matter from manufactories and dwellings, and therefore prejudicial to the public health and comfort, is not subject to the common-law doctrine against the diversion of natural watercourses, in such a sense as to debar the city from the right to straighten the course of such stream and conduct it in a covered culvert.

2. The fact that lands which had belonged to one M at the time of his death were assessed for a public improvement, as "lands of the heirs of M," whereas the greater portion of such lands had, at the date of the assessment, been divided and sold to different parties, and an ordinance required *lands subjected to assessment to be particularly described in making the assessment, but it did not appear that the conveyances from the heirs of M were of record, or that the city authorities had notice thereof,— does not present a case of substantial error calling for the intervention of equity to restrain the collection of the assessment.

3. The improper construction of a public improvement by a city, or the inadequacy of such improvement to answer the purpose of its construction, are matters for the consideration of the city council, and are not the subjects of review by the court of chancery.

Bill to restrain the collection of an assessment for the construction of a culvert.—The reasons why the complainants ask the intervention of this court by means of injunction may be stated as briefly as possible, consistent with a clear apprehension of the merits of the case, as follows: Some of the plaintiffs are heirs at law of John Montgomery, who died intestate seised of certain lands in the city of Wilmington; others of the plaintiffs have succeeded to the rights of other heirs of John Montgomery by purchase; together they own the whole of said land.

The bill states that after the death of John Montgomery, and several months before the assessment and apportionment stated in the bill was entered in the lien-book of said city, all of the lands described in the bill as lots 1, 2, and 3, with the exception of a certain piece of lot No. 1, which is now held in common by William A. Murphey, Elizabeth E. Murphey, Mary Quimby, Sarah Jane Ochiltree, and Alexander Montgomery, were sold at public sale in the said city, and conveyed in fee simple by the heirs at law of John Montgomery to sundry other persons who were the purchasers thereof; and that none of the said heirs at law were seised of any portion of said lands and premises, with the exception of the part of No. 1, as mentioned, on the 8th day of September, 1873.

The holders of the said land at the present time are mentioned either as plaintiffs or defendants in this suit.

Through and over a portion of the land described in the bill as lot No. 1, it is stated that there ran, prior to the death of said Montgomery, and until recently, a natural and perennial stream, watercourse, run, or rivulet, commonly called and known as Shipley Run, which stream has its origin in certain natural springs of water in the northwestern portion of the city of Wilmington, following generally a southerly course or direction, and empties into the Christiana River. That the said stream, at the time last aforesaid, pursued a course the general direction of which in its relation to the line of Munroe Street was as follows: to wit, the said stream crossed Munroe Street at its first point of contact with said street between Eighth and Ninth streets, in a culvert or conduit constructed under Munroe Street, running in a diagonal direction southerly across the said street from the westerly to the easterly side thereof; thence the said stream in a sinuous course pursues a generally southwesterly direction, between Munroe Street on the west and Madison Street on the east, until it again in a subterranean culvert or conduit crosses Munroe Street diagonally in a westerly direction from the easterly to the westerly side of the said street, the said stream crossing the easterly side of Munroe Street at the distance of

about 20 yards measured northerly along the said side of the said street, from the intersection of the said side of the said street with the northerly side of Second Street, and crossing the westerly side of Munroe Street at about the point of intersection of the said side of the said street with the southerly side of Second Street; thence the said stream pursuing its natural course through the said lot No. 1, the surface of which said lot was at that time and is now depressed several feet below the grade or level of those portions of Second, Adams, Front, and Munroe streets which bound the said lot, flowed in a westerly direction until it approached within the distance of about 8 or 10 yards of the easterly side of Adams Street, and reached the distance of about 84 or 86 yards westerly in a right line from the westerly side of Munroe Street; thence, bending southerly, the said stream followed a course which, though sinuous and irregular when viewed in detail, in its general direction, was nearly parallel with Adams Street, and crossed Front Street in a culvert or conduit at the distance of about 20 yards easterly from the easterly side of Adams Street; thence the said stream pursuing a general southerly course, and bending easterly gradually in its progress, crossed Munroe Street in a culvert or conduit from the westerly to the easterly side thereof at or about the intersection of Munroe Street with Maryland Avenue; and thence pursued a devious course southerly to the Christiana River.

The city council of Wilmington, for the purpose of improving Munroe Street in said city, caused a culvert to be built under the surface of said street, which passed by, along, and through these lands formerly belonging to John Montgomery. It seems that one half of the expense of building said culvert was borne by the city, and for the payment of the other half of the expense a tax was levied, and a portion of said one-half expenses was assessed to be borne by said land, the owners of which were designated in the assessment as the heirs of John Montgomery. Other property-holders on Munroe Street were similarly taxed for the payment of their share of the expenses in the construction of the culvert.

The proper city officer for that purpose—William H. Griffith, city auditor—has received official instructions to collect the said assessment, apportionment, or claim, and threatens, as city auditor, to collect the same. And there being no personal estate of the said John Montgomery which can be levied upon, the complainants state in their bill that the said William H. Griffith, under color of authority as city auditor, will collect the same unless restrained by injunction.

A preliminary injunction has heretofore been awarded in answer to the prayer of the complainants; and the cause comes now before the chancellor to be heard on bill, answer, exhibits, and depositions taken in the cause.

*Edward G. Bradford Jr.*, for the complainants:

It was not only the right, but also the duty, of the city to keep the culvert crossing Front Street open, clear, and unobstructed. Del. Rev. Code, 443; City Ord. 278.

The city could have been held liable for any damage resulting to said lands by reason of its failure to do this. *Parker* v. *Lowell*, 11 Gray, 353; *Perry* v. *Worcester*, 6 Gray, 544; Dill. Mun. Corp. 2d ed. §§ 778, 797.

Even upon the assumption that flooding was caused by the filling up of the bed of said stream, or its obstruction at a point below said lands, the city was at fault; for it was its duty to keep said watercourse open, clear, and unobstructed. Del. Rev. Code, 443; City Ord. 278.

Corporate powers of municipalities are to be strictly construed; and any act or proceeding by a city, not clearly warranted by its charter, is illegal and void. Dill. Mun. Corp. § 55.

The only provision of the city's charter which, at the time said culvert was constructed, authorized the opening and construction of gutters, drains, sewers, etc., and the laying of a special assessment to defray the expense thereof, is the Act of January 30, 1866. Del. Rev. Code, 443.

The Act for the altering and changing the course and direction of natural streams within the city limits was not

passed until April 10, 1873, which was a considerable time after the construction of said culvert, and the diversion of said stream into the same.   Del. Rev. Code, 444.

A corporate power on the part of a city to make a local improvement does not confer or imply the power to lay a special assessment upon property benefited to pay for such improvement.   Such an assessment can be laid only where the power to do so is plainly conferred and strictly followed. *Philadelphia* v. *Tryon*, 35 Pa. 401; *Philadelphia* v. *Greble*, 38 Pa. 339; *Mauch Chunk Borough* v. *Shortz*, 61 Pa. 399; *Wright* v. *Chicago*, 20 Ill. 252; *Columbia* v. *Hunt*, 5 Rich. (S. C.) 550; *Chicago* v. *Wright*, 32 Ill. 192; *Annapolis* v. *Harwood*, 32 Md. 471; *Fairfield* v. *Ratcliffe*, 20 Iowa, 396; Dill. Mun. Corp. § 596.

A man has no right of property in the flow of mere surface water upon or over his land.   *Bowlsby* v. *Speer*, 2 Vroom, 351; *Luther* v. *Winnisimmet Co.* 9 Cush. 171; *Ashley* v. *Wolcott*, 11 Cush. 192; *Parks* v. *Newburyport*, 10 Gray, 28; *Flagg* v. *Worcester*, 13 Gray, 601; *Dickinson* v. *Worcester*, 7 Allen, 19; *Goodale* v. *Tuttle*, 29 N. Y. 459; *Greatrex* v. *Hayward*, 8 Exch. *291; *Rawstron* v. *Taylor*, 11 Exch. *369; *Broadbent* v. *Ramsbotham*, Id. *602; Dill. Mun. Corp. § 798.   But a man has a legal right of property in the flow of a natural unnavigable stream in its accustomed course over his land, which right is inseparably connected with, and to all intents and purposes to be considered as, part of the freehold.   *Shields* v. *Arndt*, 3 C. E. Green, 234; *Corning* v. *Troy Iron & Nail Factory*, 39 Barb. 311; *Arnold* v. *Foot*, 12 Wend. 330; *Cowles* v. *Kidder*, 24 N. H. 364; *Gilman* v. *Tilton*, 5 N. H. 231; *Gillett* v. *Johnson*, 30 Conn. 180; *Wheatley* v. *Paugh*, 25 Pa. 528; *Tyler* v. *Wilkinson*, 4 Mason, 397; *Delaney* v. *Boston*, 2 Harrington, 489; *Clark* v. *Wilmington*, 5 Harrington, 243; Ang. Watercourses, §§ 8, 90.

Such right exists in full force, although such stream may be of a diminutive size.   *Earle* v. *De Hart*, 1 Beas. 280; *Gillett* v. *Johnson*, 30 Conn. 180; *Wheatley* v. *Baugh*, 25 Pa. 528; *Arnold* v. *Foot*, 12 Wend. 330; *Luther* v. *Winnisimmet Co.* 9 Cush. 171.

If such right be violated, either by the diversion of the stream from a man's land or other unwarrantable interference, an action may be sustained even without proof of actual damage. *Bolivar Mfg. Co.* v. *Neponset Mfg. Co.* 16 Pick. 241; *Hastings* v. *Livermore*, 7 Gray, 194; Ang. Watercourses, §§ 427–429, 432.

An injunction will be awarded to prevent the wrongful diversion of a natural stream from a man's land, although it does not appear that actual damage would result from such diversion. *Webb* v. *Portland Mfg. Co.* 3 Sumn. 189; *Corning* v. *Troy Iron & Nail Factory*, 39 Barb. 311; Ang. Watercourses, § 449.

A natural stream, therefore, cannot lawfully be diverted from its accustomed course over a man's land without his consent, except through an exercise of the right of eminent domain. Ang. Watercourses, §§ 8, 97, 457; *Delaney* v. *Boston*, 2 Harrington, 489.

The right of eminent domain must be clearly granted to a municipal corporation before the courts will recognize its exercise by such corporation. Dill. Mun. Corp. §§ 467–469; Cooley, Const. Lim. *530; *Thacher* v. *Dartmouth Bridge Co.* 18 Pick. 501.

Where a tax or assessment is laid partly for a legal and partly for an illegal purpose, and such tax or assessment is entire and indivisible, the whole tax or assessment is illegal and void. *Bangs* v. *Snow*, 1 Mass. 181; *Stetson* v. *Kempton*, 13 Mass. 272; *Libby* v. *Burnham*, 15 Mass. 144; *Alvord* v. *Collin*, 20 Pick. 418; *Torrey* v. *Millbury*, 21 Pick. 64; *Wells* v. *Burbank*, 17 N. H. 393; *Elwell* v. *Shaw*, 1 Me. 339; *Joyner* v. *Egremont School District*, 3 Cush. 567.

A law depriving a man of his private property without his consent, and without providing a tribunal for the assessment of his damages, is unconstitutional and void. *Perry* v. *Wilson*, 7 Mass. 393; *Callender* v. *Marsh*, 1 Pick. 418; *Thacher* v. *Dartmouth Bridge Co.* 18 Pick. 501; *Gardner* v. *Newburgh*, 2 Johns. Ch. 162; *Bloodgood* v. *Mohawk & Hudson R. Co.* 18 Wend. 9; *Fletcher* v. *Auburn & Syracuse*

*R. Co.* 25 Wend. 462; *People* v. *Hayden*, 6 Hill, 359; *Beek-man* v. *Saratoga & Schenectady R. Co.* 3 Paige, 45; *Smith* v. *Helmer*, 7 Barb. 416; *Whiteman* v. *Wilmington & Susque-hanna R. Co.* 2 Harrington, 514; 2 Kent, Com. *339; Cooley, Const. Lim. *560; Dill. Mun. Corp. §§ 480, 482.

It is not competent for the State, through the Legislature, to fix directly the amount of damages; for this would make it the judge in its own cause. Cooley, Const. Lim. *563.

The mode prescribed for the laying of such assessments must be strictly followed, or they will be illegal and void. Dill. Mun. Corp. § 610. The above provides that the street commissioner shall report to the city council an estimate of the value of the lands upon which the expense of making the improvements contemplated by the Act of 1866 ought to be assessed; such estimate of value to be make independently of any buildings or improvements upon such lands. No such estimate in the case before the court was ever made or reported to the city council. The assessment in question is therefore illegal and void. *Zack* v. *Pennsylvania R. Co.* 25 Pa. 394; *Rathbun* v. *Acker*, 18 Barb. 393; Dill. Mun. Corp. § 610.

As the Act requires such an assessment to be against the person and property of those benefited or those owning or holding land, that assessment must, to be valid, be against, not reputed owners, but those particularly benefited, or the actual owners or holders of the land. *Washington* v. *Pratt*, 1 U. S. 8 Wheat. 681 (5 L. ed. 714).

The assessment in question, therefore, being laid against the "estate of John Montgomery," and not against either those particularly benefited or the owners or holders of said lands, is unauthorized by the city charter, and is illegal and void.

*A fortiori* is this the case, in view of the fact that the "estate of John Montgomery" had been sold and conveyed as aforesaid before said assessment was laid and entered in said lien-book. *Whitney* v. *Thomas*, 23 N. Y. 281; *State* v. *Hardin*, 5 Vroom, 79.

The assessment in question, not having been laid and apportioned upon the basis of local benefit received, is illegal and void. *State* v. *Hudson*, 5 Dutch. 104; *State* v. *Bergen*, Id. 266; *State* v. *Gardner*, 5 Vroom, 327; *Clapp* v. *Hartford*, 35 Conn. 66.

Said assessment, being illegal and void, cannot be collected, unless the complainants are precluded by estoppel from contesting its validity.

Three elements must therefore coexist in order that an equitable estoppel can arise: (1) some act, conduct, or declaration intended or directly calculated to induce action or omission of action by an innocent person; (2) action taken or omitted by such innocent person upon the faith and in pursuance of such act, conduct, or declaration; (3) the accruing of injury or damage to such innocent person if such act, conduct, or declaration should be nullified or rejected. *Wilmington & Brandywine Bank* v. *Wollaston*, 3 Harrington, 90; *Eldred* v. *Hazlett*, 33 Pa. 307; *Welland Canal Co.* v. *Hathaway*, 8 Wend. 480; *Dezell* v. *Odell*, 3 Hill, 215; *Truscott* v. *Davis*, 4 Barb. 495; *Martin* v. *Angell*, 7 Barb. 407; *Otis* v. *Sill*, 8 Barb. 102; Am. note to *Doe* v. *Oliver*, 2 Smith, Lead. Cas. *568, 605.

The facts proved in this cause utterly fail to furnish the requisites of an equitable estoppel as against the complainants.

The operation of an equitable estoppel will not extend further in any case than is necessary to prevent one person from being injured through his reliance upon the act, conduct, or declaration of another person. *Truscott* v. *Davis*, 4 Barb. 495; *Martin* v. *Angell*, 7 Barb. 407; *Lounsbury* v. *Depew*, 28 Barb. 44; *Kinney* v. *Farnsworth*, 17 Conn. 355; Am. note to *Doe* v. *Oliver*, 2 Smith, Lead. Cas. *568.

A careful examination of the facts disclosed in this cause demonstrates the fact that the proceeding of the city which has been enjoined is an illegal and unconstitutional attempt on the part of the city to compel the complainants to bear the expense of abating a gross nuisance on their lands, for which the city was responsible, and which the city for many years wrongfully permitted to continue.

But, aside from all the grounds for defense to said assessment which have been heretofore urged, it is manifest that the city should not be permitted by a court of equity to punish the complainants for its own dereliction of duty.

A leading case, in its principle directly in point, is *Weeks* v. *Milwaukee*, 10 Wis. 243, in which the court says: " I am also of the opinion that the tax assessed against the plaintiff's lots to abate a nuisance which, it appears, was created entirely by the act of the city in so constructing a street as to cause the water to flow and remain upon the lots, which it would not otherwise have done is, illegal. I cannot recognize the right of a corporation to create a nuisance on the lot of an individual. But to create the nuisance, and then tax him to abate it, is a double wrong. I shall not attempt any examination of the question upon authority, but I am satisfied such a right cannot be sustained. I think this conclusion results from the reasoning of *Mr. Justice* Smith, in *Goodall* v. *Milwaukee*, 5 Wis. 32, which I fully approve. And until I am prepared to say that private rights must yield, even to the extent of total destruction, rather than place any impediment in the way of whatever proceedings corporations may see fit to take, I cannot say that a city may create a nuisance on the lot of a citizen without making him any compensation for the damage, and then tax him to abate it."

The jurisdiction of this court to grant the relief prayed for is indisputable. *Dows* v. *Chicago*, 78 U. S. 11 Wall. 108 (20 L. ed. 65); *Commonwealth* v. *Colley Township*, 29 Pa. 121; *Miller* v. *Gorman*, 38 Pa. 309; *Barr* v. *Deniston*, 19 N. H. 170; *Morris Canal & Banking Co.* v. *Jersey City*, 1 Beas. 227; *Hoagland* v. *Delaware Township*, 2 C. E. Green, 106; *Frewin* v. *Lewis*, 4 Mylne & C. *249; 2 Story, Eq. Jur. § 955; Dill. Mun. Corp. §§ 727, 728, 731, 737, 738; Hill. Inj. 3d ed. 504–509.

The injunction heretofore awarded in this cause should therefore be made perpetual.

*Samuel A. Macallister, Walker Cummings,* and *George H. Bates* for the defendants.

The Chancellor.—The complainants have in their bill very minutely described " Shipley Run " from its sources to its mouth.

The bill is filed, not as a complaint in respect to anything done by authority of the city council during a long series of years previous to the assessment of a tax upon property-holders to pay a share of the expenses for constructing a culvert along Munroe Street, in respect to said Run, but solely to restrain the collection of any part of said taxes from the complainants, or rather from a sale of the lands, late of John Montgomery, of which they claim to be the present holders and owners, as stated in their bill of complaint.

Their solicitor has argued that Shipley Run is a natural watercourse; and the contention in effect seems to be that the city council had no authority to construct the culvert down Munroe Street, in such a manner that the waters of said Run would be diverted from their original course.

The bill itself states that Shipley Run, had, before the building of said culvert, passed through culverts along and across several streets in said city before it reached Munroe Street.

If the condition of Shipley Run was such as described in the complainants' bill, it was certainly the duty of the city to have guarded the health and comfort of the inhabitants against alarming consequences which might reasonably have been anticipated from the condition of said " natural watercourse," as it is called, long before they awoke to the necessity of performing this duty by the construction of this culvert in Munroe Street.

The complainants themselves, in their bill, say " that said Shipley Run, in its course through the said lot No. 1, was a stream of considerable size, having during the dry season a width of from 6 to 8 feet, an average depth of from 6 to 12 inches, and running with reasonable rapidity; that the said stream, during the prevalence of rains, increased in size to many times its ordinary volume, frequently becoming a torrent, and, by reason of the failure of the said city to keep the

channel of said culvert or conduit (existing before the one in Munroe Street was made) crossing Front Street, as aforesaid, open and unobstructed, overflowing its banks and submerging the said lot No. 1."

Again, section 5 of the bill states "that the waters of the said Shipley Run, before reaching the said premises, passed by or under sundry slaughter-houses, leather manufactories, and industrial establishments of other kinds, as well as the filth from sundry sinks constructed over them, or by the side of the said stream and the foul and unwholesome surface water from many dwelling-houses; that the said stream thus contaminated and polluted did, in its passage through the said lot No. 1, which then was and still is open and wholly unoccupied, not only injuriously affect the value of said premises, but did prove much detrimental to the comfort, health, and interests of the whole neighborhood, which then contained a large population."

Now, it should be observed that this bill is filed, not for relief against anything that has been done by the city council of Wilmington previously to the building of the culvert down Munroe Street, but only for that which is alleged to have been the result of building that culvert down said street and through said lot No. 1.

The effect of building that culvert was to divert the said Shipley Run, thus contaminated and polluted, through lot No. 1, that it might not thereafter injuriously affect the value of said premises, as it was said to do in the bill itself, before said culvert in Munroe Street was built, but much more; that it might not in future prove detrimental to the comfort, health, and interest of the whole neighborhood, which then contained a large population, as it had theretofore done.

Surely if the city council of Wilmington and those acting under its authority never committed greater wrong or injury to the people of that city than they have done by the building of the Munroe Street culvert, they will deserve praise, and not blame.

It is a perversion of the common-law doctrine in respect to

the diversion of natural watercourses to apply that doctrine to such a stream,—if stream it can be possibly called,—as that of Shipley Run, rising in the springs of the northern part of the city and passing, by a sinuous course, under sinks and manufactories, through culverts, and emptying its filth, before it finally discharges into the Christiana River, upon low ground in the midst of the city, and endangering the health and comfort of a numerous surrounding population.

Shipley Run is no such watercourse as the municipal authorities of a large city, like Wilmington, may not divert or fill up, if they choose, for the protection of the lives, health, and comfort of the inhabitants of the city.

I therefore dismiss this part of the complaint without further consideration or remark.

The only remaining branch of the case, made by the bill, that requires notice, are the facts that, John Montgomery being dead the greater part of these three lots mentioned in the bill had, by his heirs at law, been sold at public sale in the city of Wilmington, and conveyed to sundry purchasers ; and that the assessment made for the construction or building of the culvert along Munroe Street was against the heirs of John Montgomery, or lands of the heirs of John Montgomery, and not lands of the several purchasers of said lands formerly belonging to John Montgomery; and that the particular shares so sold to the purchasers thereof were not particularly described as they should have been according to an ordinance of the city council.

In respect to the objection taken in the bill to the impropriety, if any, in this respect, it may be remarked that the subject-matter assessed—namely, the lands which formerly belonged to John Montgomery—was liable to assessment notwithstanding any divisions thereof which may have been made by his heirs; and notwithstanding who may have become the purchaser of the several subdivisions thereof.

Even if it be admitted (of which, however, there is no proof in this cause) that the city council, or Griffith acting under its authority, knew of the divisions of the said land as

Opinion: not case for relief in equity.

stated in the bill by the heirs of John Montgomery, there is no allegation in the bill, and no proof, that the conveyances by the heirs, if any such existed, to the purchasers, were matters of record, which were noticed to Griffith or the city council.

The court of chancery, in affording relief, regards the evil or the wrong complained of only when it is substantial, and not trifling or unsubstantial.

Equity regards the substance and not the accidents of things; and courts of equity will not intervene where substantial justice does not require such intervention.

Knowing that the lands formerly of John Montgomery, which some of them had inherited as his heirs at law, and some had purchased from those heirs as his heirs at law, were liable for a proportionate share of the expenses in making and constructing the culvert down Munroe Street; and that said lands were liable for the payment thereof whoever might be the holder and the owner of same; which facts were known to the plaintiffs in the bill of complaint before it was filed, or it would not have been filed,—it was perfectly competent for them to ascertain their proportionate shares thereof by computation among themselves, and to discharge the tax as a lien upon said land, by the payment thereof, without invoking the aid of a court of equity to intervene and thus become a supervisor in respect to the compliance or noncompliance with all the ordinances of a great city, by its officers in the administration of the multifarious affairs of the city.

I pass by, entirely, all suggestions made in the bill as to the improper construction of the culvert mentioned, and of its inadequacy to answer the purposes for which it was constructed.

These were matters wholly for the consideration of the city council, and are not the subjects of review in this court.

I shall therefore decree that the preliminary injunction heretofore awarded in this cause be dissolved, and that the bill be dismissed, with costs.